UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT BOWLING GREEN


**DARYL KOERNER**
    Plaintiff

**v.**                                                                                                  **No. 1:09CV-00111-J**

**MICHAEL ASTRUE**
    Commissioner of Social Security
    Defendant


# MAGISTRATE JUDGE'S REPORT
# and RECOMMENDATION

This matter is before the court upon the plaintiff's complaint seeking judicial review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g). The plaintiff is represented by M. Gail Wilson. The fact and law summaries of the plaintiff and the defendant are at Docket Entry Nos. 16 and 17, respectively. This matter has been referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636.

The final decision of the Commissioner was rendered on November 28, 2008, by administrative law judge (ALJ) Ronald Kayser. In support of his decision denying Title II benefits, Judge Kayser entered the following numbered findings:

    1. The claimant last met the insured status requirements of the Social Security Act on December 31, 2006.

    2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of August 24, 2001, through his date last insured of December 31, 2006 (20 CFR 404.1520(b) and 404.1571 et seq.).

    3. Through the date last insured, the claimant had the following severe impairments: a spur in the cervical spine, status-post cervical disc herniations, cervical fusion and plate installation; status-post lumbar discectomy; and a major depressive disorder.

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that he could not engage in climbing of ropes, scaffolds and ladders, but could frequently climb ramps and stairs; could not more than occasionally crouch, crawl and stoop; was limited in his ability to work around whole body vibration, dangerous heights and machinery; and could not more than occasionally reach overhead with his right upper extremity. He had a very good (unlimited) ability to understand, remember and carry out simple job instructions; a good (more than satisfactory) ability to function independently and maintain personal appearance; a good ability to follow work rules, relate to co-workers, use judgment, interact with supervisors, maintain attention and concentration, and demonstrate reliability; a fair ability to understand, remember and carry out complex job instructions; a poor (limited but not totally precluded) ability to deal with work stresses, deal with the public, and behave in an emotionally stable manner; and a fair to poor ability to relate predictably in social situations.

6. Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

7. The claimant was born on July 23, 1958, and was 48 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant had a high school education and was able to communicate in English during the relevant period (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant was "not disabled," whether or not the claimant had transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11. The claimant was not under a disability as defined in the Social Security Act, at any time from August 24, 2001, the alleged onset date, through December 31, 2006, the date last insured (20 CFR 404.1520(g)).

(Administrative Record (AR), pp. 26-32).

## Governing Legal Standards

1. The court has jurisdiction to examine the record that was before the Commissioner on the date of the Commissioner's final decision and to enter a judgment affirming, modifying, or reversing that decision. 42 U.S.C. § 405(g), sentence four. In exercising its "sentence four" jurisdiction, the court is limited to determining whether the Commissioner's controlling findings are supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his decision. *Richardson v. Perales*, 402 U.S. 389 (1971). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Kirk v. Secretary*, 667 F.2d 524 (6th Cir., 1981). It has been described as a sufficient amount of evidence "to justify, if the trial were to a jury, a refusal to direct a verdict." *Sias v. Secretary*, 861 F.2d 475, 480 n. 1 (6th Cir., 1988). In determining whether the Commissioner's findings are supported by substantial evidence, the court must examine the evidence in the record taken as a whole and must take into account whatever in the record fairly detracts from its weight. *Wyatt v. Secretary*, 974 F.2d 680 (6th Cir., 1992). However:

> The substantial-evidence standard allows considerable latitude to administration decision makers. It presupposes that there is a zone of choice within which the decision makers can go either way, without interferences by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.

*Mullen v. Secretary*, 800 F.2d 535, 545 (6th Cir., 1986).

When conducting substantial evidence review, the court is restricted to a consideration of the evidence that was before the Commissioner on the date of the final decision. When the Appeals Council declines to review the ALJ's decision and render a new decision, the ALJ's

decision becomes the Commissioner's final decision. *Cotton v. Secretary*, 2 F.3d 692 (6th Cir., 1993).

    2. To be entitled to disability insurance benefits (DIB), a claimant must be under the age of 65 years, must meet the insured status requirements of Title II of the Social Security Act, and must be under a disability as defined by the Act.

    3. Disability determination is a five-step sequential evaluation process, to-wit:

**STEP #1** The claimant must not be engaged in substantial gainful activity.

**STEP #2** The alleged disabling impairment must be "severe." A "severe" impairment is one that "significantly limits" a claimant's ability to do "basic work activities" that are "necessary to do most jobs" such as walking, standing, sitting, lifting, seeing, hearing, and speaking. 20 C.F.R. §§ 404.1521 and 416.921.

**STEP #3** If the claimant has a medical condition that meets or exceeds the criteria for an impairment defined in Appendix 1 of 20 C.F.R. Part 404, Subpart P of the regulations ("the Listing"), a conclusive presumption attaches that the claimant is disabled.

**STEP #4** The claimant must not be able to perform his past relevant work either as he actually performed it or as it generally performed in the national economy.

**STEP #5** If the claimant makes a <u>prima facie</u> showing that he cannot perform his past relevant work, the burden of going forward with evidence shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can perform. *Born v. Secretary*, 923 F.2d 1168 (6th Cir., 1990). The focus of judicial review in Step #5 cases is typically whether the controlling hypothetical posed to the vocational expert reflected all vocationally significant physical and mental limitations actually suffered by the claimant. *Varley v. Secretary*, 820 F.2d 777 (6th Cir., 1987).

*Procedural history*

On May 24, 2004, the plaintiff filed an application for Title II benefits, alleging that he became disabled on August 24, 2001. The plaintiff was last insured for Title II benefits on December 31, 2006.

On May 18, 2006, Judge Kayser issued a prior denial decision in which he accepted the assessment of the plaintiff's physical limitations given at the administrative hearing by medical advisor Charles Hancock, M.D. (AR, pp. 49-55). Judge Kayser found that, although he can no longer perform his past relevant work, the plaintiff retains the ability to perform a significant number of light and sedentary jobs in the national economy.

On June 8, 2006, the plaintiff filed a new application for benefits (AR, p. 334).

On April 27, 2007, the Appeals Council consolidated the plaintiff's new application with Judge Kayser's prior decision and remanded the matter for a new decision as to both claims, finding that Judge Kayser had failed to consider impairments for which the plaintiff received treatment, including rheumatoid arthritis affecting the hands, osteoarthritis of the knees, anxiety, and depression (AR, pp. 332-334).

On November 28, 2008, Judge Kayser issued the decision that is presently before this court upon judicial review. Dr. Hancock once again testified as a medical expert, and once again, the ALJ accepted Dr. Hancock's testimony, finding that the plaintiff retains the ability to perform a significant number of light jobs in the national economy. Finding Nos. 5 and 10.

*Medical history*

In 1998, the plaintiff injured his back while moving a 500-pound drum. He underwent a L5-S1 discectomy (AR, p. 526). After back surgery, the plaintiff continued to complain of pain radiating into the left lower extremity and buttocks and numbness on the lateral aspect of the left foot. Despite these symptoms, the plaintiff worked for some time as a roofer. However, he re-injured his back and last worked on or about August 24, 2001.

In April of 2003, the plaintiff underwent a C5-C6 discectomy and fusion with placement of an anterior cervical plate. Following neck surgery, the plaintiff complained of pain radiating into the right upper extremity, limited range of cervical motion, and numbness of the fourth and fifth digits of both hands. In March of 2004, the plaintiff described his cervical symptoms to Francisco Batlle, M.D., in the following terms (AR, p. 204) *(emphasis added to show the plaintiff's physical limitations as described by the treating sources)*:

> The patient now continues to describe an "intermittent burning sensation" along the medial border of the right scapula and intermittent numbness and tingling of the right upper extremity, again in a nondermatomal distribution. **He describes worsening symptomatology after prolonged sitting and standing.**

Dr. Batlle reported that an EMG and nerve conduction velocity study dated February 19, 2004, demonstrated bilateral C6 radiculopathy (AR, p. 205). In April of 2004, approximately one month before the plaintiff filed his first application for benefits, orthopedic surgeon Joe Daniels opined as follows (AR, p. 234) *(emphasis added)*:

> **Patient is able to do office work and avoid constant sitting or standing. Patient will also benefit from 15-minute breaks every hour during the day for stretching and muscle toning.** Also due to patient's condition to function under these restrictions patient may need to continue pain medication as needed to tolerate condition. Due to patient's residual cervical radiculopathy and the type of fusion he had I feel in all medical probability his restrictions are permanent. Also, there will be probabilities of future surgical intervention of the cervical spine if there is

evidence of muscle atrophy or acute compression of the cervical spine. Patient should avoid any aggravation to the cervical spine due to persistent cervical radiculopathy.

On October 23, 2007, following remand, the plaintiff was examined at the request of the Commissioner by Rita Ratliff, M.D. Dr. Ratliff's narrative report and completion of the standard physical assessment form is at AR, pp. 526-536. Dr. Ratliff opined that the plaintiff retained the ability to perform a significant range of light work.

On April 14, 2008, in light of his ongoing cervical complaints, the plaintiff's treating physician, Donald Weidler, obtained a cervical MRI, which revealed, among other things, the following (AR, p. 548):

> At the C6-C7 level there is a broad-based disc osteophyte complex that is slightly greater on the right (see sagittal images 25 through 28 and axial images 80, 81 and 82). There could be some narrowing of the right neural foramen at the C6-C7 level.

Dr. Weidler referred the plaintiff to neurologist O. Amr El-Naggar for evaluation. On June 16, 2008, based upon his examination of the plaintiff and the results of the MRI, Dr. El-Naggar opined that, while the C5-C6 fusion remained "solid," the plaintiff now suffers from a disc herniation at the C6-C7 level with compression of the right C7 nerve resulting in "severe right C7 radiculopathy" (AR, p. 570). Dr. El-Naggar recommended neck surgery and opined that the plaintiff is "disabled" because "[e]ven sedentary work would cause him to have significant pain and discomfort" (AR, p. 570).

On July 21, 2008, a second administrative hearing was held in this case in which Dr. Hancock testified as a medical expert. The ALJ accepted Dr. Hancock's testimony that the plaintiff retains the ability to perform a limited range of light work. Finding No. 5.

## *Treating physician rule*

The plaintiff argues that the ALJ's decision to credit the testimony of the non-examining medical advisor, Dr. Hancock, was in violation of the so-called treating physician rule. A treating source's medical opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." 20 C.F.R. § 404.1527(d)(2). For the reasons set forth below, the magistrate judge concludes that the treating physician rule is inapplicable in this case because there is no genuine medical opinion by a treating source, particularly an opinion bearing on the issue of what the plaintiff can still do despite his impairments, and that is necessarily inconsistent with Dr. Hancock's testimony and the ALJ's residual functional capacity (RFC) Finding No. 5.

As noted above:

1. Treating source, Dr. Batlle, noted that the plaintiff "describes worsening symptomatology after prolonged sitting and standing" (AR, p. 204).

2. Dr. Batlle reported that an EMG and nerve conduction velocity study dated February 19, 2004, demonstrated bilateral C6 radiculopathy (AR, p. 205).

3. Treating source, Dr. Daniels, opined that the "[p]atient is able to do office work and avoid constant sitting or standing."

4. Dr. Daniels stated that the plaintiff would "benefit from 15-minute breaks every hour during the day for stretching and muscle toning" (AR, p. 234).

The magistrate judge concludes as follows:

1. Many individuals continue to sit and stand during the workday despite "worsening symptomatology [and] significant pain and discomfort."

2. As a lay individual, an ALJ is "simply not qualified to interpret raw medical data in functional terms." *Nguyen v. Commissioner*, 172 F.3d 31, 35 1st Cir., 1999). Furthermore, the mere diagnosis of a condition does not prove its severity, and its disabling effects must still be shown. *Higgs v. Commissioner*, 880 F.2d 860, 863 (6th Cir., 1988).

3. Finding No. 5 does not contemplate "constant" sitting and standing.

4. As Dr. Hancock explained, while it may be a laudable "personal plan" that the plaintiff engage in 15 minutes of stretching and muscle toning exercises every hour, it is not an actual medical requirement or limitation typically prescribed for individuals in the plaintiff's "category" (AR, pp. 234 and 596). In other words, the suggestion that the plaintiff should engage in frequent stretching was not a genuine "medical" opinion.

The magistrate judge concludes that there was no violation of the treating physician rule.

### *Radiculopathy*

Next, the plaintiff objects to the ALJ's weighing of the opinion of the one-time examining source, Dr. El-Naggar. Based upon his interpretation of a cervical MRI from June of 2008, Dr. El-Naggar opined that the plaintiff suffers from <u>severe</u> C7 radiculopathy (AR, p. 570). According to the ALJ, Dr. Hancock rejected Dr. El-Naggar's interpretation and opined that the plaintiff suffers from "no stenosis or nerve root impingement such as to cause radiculopathy" (AR, p. 30).

As a preliminary matter, the undersigned acknowledges that, like the treating sources, Dr. Naggar offered no medical opinion that is inconsistent with Finding No. 5. Dr. El-Naggar did opine that the plaintiff is "disabled" because "[e]ven sedentary work would cause him to have significant pain and discomfort" (AR, p. 570). However, raw "opinions that you are disabled" are not genuine medical opinions that are entitled to any "special significance." See 20 C.F.R. § 404.1527(e).

Dr. El-Naggar did, however, offer a medical opinion that is inconsistent with the ALJ's finding of no radiculopathy. As noted above, the ALJ based his complete discounting of the presence of C7 radiculopathy upon Dr. Hancock's testimony. This inconsistency is of great importance in this case because Drs. El-Naggar and Hancock were the only medical sources to offer an interpretation of the results of the MRI from June of 2008. See "medical history," supra. For the reasons indicated below, we shall conclude that the ALJ's finding of no radiculopathy was unsupported by substantial evidence.

However, even if Dr. Hancock's testimony provided the ALJ with a substantial basis for finding no C7 radiculopathy, the record contains uncontradicted evidence of the presence of bilateral C6 radiculopathy, based upon the results of an EMG and nerve conduction velocity study in February of 2004, and of residual radiculopathy affecting the lower extremities following L5-S1 discectomy in or around 1998. See AR, pp. 205 and 254. There is no evidence that Dr. Hancock and the ALJ considered the existence and impact of C6 and lumbar radiculopathy in determining that the plaintiff retains the ability to perform a limited range of light work. Therefore, while Finding No. 5 is not necessarily inconsistent with any particular medical opinion in the record, it is nevertheless unsupported by any medical opinion that properly took into account the effect of the

10

plaintiff's impairments as a whole. Therefore, we shall recommend a remand for development of the medical evidence in this case.

In his written decision, the ALJ identified two alternative bases for rejecting Dr. El-Naggar's finding of severe right C7 radiculopathy. First, the ALJ found that Dr. El-Naggar's finding from June of 2008, is "not relevant to this decision since it pertains to a time almost 1.5 years after the end of the relevant period (the December 31, 2006, date last insured)" (AR, p. 31). The plaintiff argues that the ALJ's finding was erroneous as a matter of law because "[a]fter dated records can certainly be used to validate and substantiate prior complaints if they relate to the area causing disability during the insured period" (Docket Entry No. 16, p. 6). The magistrate judge concludes that the plaintiff's argument has merit because there is no persuasive reason to doubt that, to the extent it existed at all, the C7 radiculopathy existed prior to the date last insured.

Second, the ALJ rejected Dr. El-Naggar's finding of severe C7 radiculopathy in reliance upon Dr. Hancock's testimony. Dr. Hancock, in turn, disagreed with Dr. El-Naggar's interpretation of the MRI, finding that it showed only a "small defect, osteophyte defect at C6-7" (AR, p. 591). In light of this characterization and the relatively negative examination findings of Dr. Ratliff, Dr. Hancock opined that there was no adequate clinical basis for a finding of radiculopathy. The magistrate judge concludes that Dr. El-Naggar's opinion was entitled to greater weight than Dr. Hancock's because, unlike Dr. Hancock, Dr. El-Naggar had the benefit of a clinical examination of the plaintiff and he had access to the MRI images themselves (e.g., sagittal images 25 through 28 and axial images 30 through 82) as opposed to merely the MRI report at AR, pp. 548-549. Furthermore, Dr. Hancock's reliance upon Dr. Ratliff's negative findings was of questionable validity because Dr. Ratliff examined the plaintiff prior to the MRI results.

In summary, a remand is required in this case for a medical opinion with respect to what the plaintiff can still do despite his impairments that properly takes into account all of the clinical evidence pertaining to possible radiculopathy at the C7, C6, and lumbar levels.

### *Arthritis of the hands*

As noted above, on April 27, 2007, the Appeals Council remanded this matter for a new decision, finding that Judge Kayser had failed to consider various impairments for which the plaintiff received treatment, including rheumatoid arthritis affecting the hands (AR, pp. 332-334). Upon remand, the ALJ apparently did not develop the evidence pertaining to possible arthritis of the hands and its limiting effects. In his written decision, the ALJ simply referred to Dr. Hancock's testimony at the prior hearing to the effect that, notwithstanding the presence of a "positive rheumatoid factor," the evidence does not support a diagnosis of rheumatoid arthritis because "the classic factors of redness, heat, swelling, pain and tenderness are not found in the medical evidence" (AR, p. 27). The ALJ apparently also relied upon his own personal observation at the prior hearing that the plaintiff "appeared with calluses on his hands and oil on his fingers" (AR, p. 27). According to counsel (Docket Entry No. 16, p. 10):

> There is nothing in the record to substantiate that fact [i.e., the alleged observation by the ALJ] and it is totally untrue. Nothing in the record indicates that the ALJ at any time examined the hands of Mr. Koerner. Counsel would state that her observations are diametrically opposed to the observations of ALJ Kayser.

The ALJ may or may not have had a substantial basis for finding that the plaintiff does not suffer from "classic" rheumatoid arthritis of the hands, and the ALJ may or may not have been justified in relying upon personal observations that are disputed by counsel. Nevertheless, at the prior hearing, Dr. Hancock admitted that the medical records reflect the presence of "swelling of the hands with some nodules" (AR, p. 662). For purposes of judicial review, it is not

12

the diagnostic label that is placed upon an impairment that is of controlling significance. Rather, the important question is the limitations, if any, caused by the impairment. In this case, there is evidence that the plaintiff suffers from some type of impairment of the hands that is capable of affecting his ability to perform the lifting/carrying requirements of light work.

## RECOMMENDATION

The magistrate judge RECOMMENDS that this matter be REMANDED to the Commissioner for a new decision and for development of the medical evidence with respect to what the plaintiff can still do despite his impairments as a whole, including possible radiculopathy at the C7, C6, and lumbar levels and a possible impairment of the hands.

**NOTICE**

Pursuant to 28 U.S.C. § 636(b)(1), as amended, any party shall have a period of fourteen (14) days, excluding intervening Saturdays, Sundays, and/or legal holidays pursuant to Fed.R.Civ.P. 6(a), from the date of notice of electronic filing within which to file written objections to the foregoing report with the Clerk of the Court. Further and pursuant to Fed.R.Civ.P. 72(b), any party may file a response to objections filed by another party within fourteen (14) days, excluding Saturdays, Sundays, and/or intervening legal holidays, after being served with a copy of said objections. A period of three days shall be added to each fourteen (14) day period above pursuant to Fed.R.Civ.P. 6(d), for a total of seventeen (17) working days.

The court shall not conduct a <u>de novo</u> review of objections that are general, conclusory, or merely adopt previous pleadings. The original objections shall be sent to the Clerk of Court either electronically or by mail. A copy of any objections and response thereto shall be served on the undersigned at Suite 330, 501 Broadway, Paducah, Kentucky, 42001 or via e-mail to w_david_king@kywd.uscourts.gov. Failure of a party to file timely objections shall constitute a waiver of the right to appeal by that party. *Thomas v. Arn*, 474 U.S. 140 (1985).